[Crim. No. 18482. In Bank. Dec. 12, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES MATTHEW GAUZE, Defendant and Appellant.

710

## COUNSEL

Paul Bell, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen and Karl J. Phaler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Can a person burglarize his own home? That is the quandary which emerges in the case of James Matthew Gauze, who appeals from a judgment of conviction of assault with a deadly weapon (Pen. Code, § 245, subd. (a)) and burglary (Pen. Code, § 459).

Defendant shared an apartment with Richard Miller and a third person and thus had the right to enter the premises at all times. While visiting a friend one afternoon, defendant and Miller engaged in a furious quarrel. Defendant directed Miller to "Get your gun because I am going to get mine." While Miller went to their mutual home, defendant borrowed a shotgun from a neighbor. He returned to his apartment, walked into the living room, pointed the gun at Miller and fired, hitting him in the side and arm. Defendant was convicted of assault with a deadly weapon and burglary; the latter charge was predicated on his entry into his own apartment with the intent to commit the assault.

Common law burglary was generally defined as "the breaking and entering of the dwelling *of another* in the nighttime with intent to commit a felony." (Italics added.) (Perkins on Criminal Law (2d ed. 1969) p. 192.) The present burglary statute, Penal Code section 459, provides in relevant part that "Every person who enters *any* house, room, apartment

. . . with intent to commit grand or petit larceny or any felony is guilty of burglary." (Italics added.)

Facially the statute is susceptible of two rational interpretations. On the one hand, it could be argued that the Legislature deliberately revoked the common law rule that burglary requires entry into the building of another.[1] On the other hand, the Legislature may have impliedly incorporated the common law requirement by failing to enumerate one's own home as a possible object of burglary. (Comment, *Burglary: Punishment Without Justification,* 1970 U.Ill.L.Forum 391, 397.) No cases directly on point have been found.[2] Therefore, in determining which statutory interpretation should be adopted it is necessary to examine the purposes underlying common law burglary and how they may have been affected by the enactment of the Penal Code.

Common law burglary was essentially an offense "against habitation and occupancy." (Perkins, *op. cit. supra,* p. 192.) By proscribing felonious nighttime entry into a dwelling house, the common law clearly sought to protect the right to peacefully enjoy one's own home free of invasion. In the law of burglary, in short, a person's home was truly his castle. (2 Blackstone, Commentaries (Jones ed. 1916) § 258, p. 2430.) It was clear under common law that one could not be convicted of burglary for entering his *own* home with felonious intent. This rule applied not only to sole owners of homes, but also to joint occupants. (*Clarke* v. *Commonwealth* (Va. 1874) 25 Gratt. 908; Perkins, *op. cit. supra,* p. 206.) The important factor was occupancy, rather than ownership.

California codified the law of burglary in 1850. (Stats. 1850, ch. 99, § 58, p. 235.) That statute and subsequent revisions and amendments preserved the spirit of the common law, while making two major changes. First, the statute greatly expanded the type of buildings protected by burglary sanctions. Not only is a person's home his castle under the statute, but so, inter alia, are his shop, tent, airplane, and outhouse. (See fn. 1, *ante.*) This evolution, combined with elimination of the requirement that the crime be committed at night, signifies that the law is no longer limited to safeguarding occupancy rights. However, by

---

[1]The term "building" is used throughout this opinion for literary convenience; section 459 actually encompasses entry into a variety of structures, not all of them buildings.

[2]Several early cases involving pleading problems appear to have assumed one cannot be charged with burglarizing his own premises. See, e.g., *People* v. *Price* (1904) 143 Cal. 351, 353 [77 P. 73]; *People* v. *LaMarr* (1942) 51 Cal.App.2d 24, 28 [124 P.2d 77]; *People* v. *Redman* (1919) 39 Cal.App. 566, 568 [179 P. 725].

carefully delineating the type of structures encompassed under section 459, the Legislature has preserved the concept that burglary law is designed to protect a possessory right in property, rather than broadly to preserve any place from all crime.

The second major change effected by codification of the burglary law was the elimination of the requirement of a "breaking": under that statute, every person who *enters* with felonious intent is a burglar. This means, at a minimum, that it no longer matters whether a person entering a house with larcenous or felonious intent does so through a closed door, an open door or a window.[3] The entry with the requisite intent constitutes the burglary.

The elimination of the breaking requirement was further interpreted in *People* v. *Barry* (1892) 94 Cal. 481 [29 P. 1026], to mean that trespassory entry was no longer a necessary element of burglary. In *Barry*, this court held a person could be convicted of burglary of a store even though he entered during regular business hours. A long line of cases has followed the *Barry* holding. (See, e.g., *People* v. *Deptula* (1962) 58 Cal.2d 225, 228 [23 Cal.Rptr. 366, 373 P.2d 430]; *People* v. *Brittain* (1904) 142 Cal. 8 [75 P. 314]; *People* v. *Edwards* (1971) 22 Cal.App.3d 598, 602 [99 Cal.Rptr. 516]; *People* v. *Garrow* (1955) 130 Cal.App.2d 75, 83 [278 P.2d 475].)

*Barry* and its progeny should not be read, however, to hold that a defendant's right to enter the premises is irrelevant. Indeed, the court in *Barry*, by negative implication, substantiated the importance of determining the right of an accused to enter premises. When the defendant thief in *Barry* argued he had a right to be in the store, the court could have replied that his right to enter the store was immaterial. Instead the court declared, "To this line of reasoning we can only say, a party who enters with the intention to commit a felony enters without an invitation. He is not one of the public invited, nor is he entitled to enter. Such a party could be refused admission at the threshold, or ejected from the premises after the entry was accomplished." (*Id.,* at p. 483.) Thus, the underlying principle of the *Barry* case is that a person has an implied invitation to enter a store during business hours for legal purposes only. The cases have preserved the common law principle that in order for burglary to occur, "The entry must be *without consent.* If the possessor

---

[3]At common law, entry through a closed door or window, whether locked or unlocked, was a breaking, but further opening a partially opened window was not. (Note, *A Rationale of the Law of Burglary* (1951) 51 Colum.L.Rev. 1009, 1012-1013.)

'actually invites the defendant, or actively assists in the entrance, e.g., by opening a door, there is no burglary." (1 Witkin, Cal. Crimes (1963) Crimes Against Property, § 457, p. 419.) (Italics in original.)

■ Thus, section 459, while substantially changing common law burglary, has retained two important aspects of that crime. A burglary remains an entry which invades a possessory right in a building. And it still must be committed by a person who has no right to be in the building.

Applying the foregoing reasoning, we conclude that defendant cannot be guilty of burglarizing his own home. His entry into the apartment, even for a felonious purpose, invaded no possessory right of habitation; only the entry of an intruder could have done so. More importantly, defendant had an absolute right to enter the apartment. This right, unlike that of the store thief in *Barry,* did not derive from an implied invitation to the public to enter for legal purposes. It was a personal right that could not be conditioned on the consent of defendant's roommates. Defendant could not be "refused admission at the threshold" of his apartment, or be "ejected from the premises after the entry was accomplished." (*People* v. *Barry* (1892) *supra,* 94 Cal. 481, 483.) He could not, accordingly, commit a burglary in his own home.

The People argue, however, that a contrary conclusion is compelled by a dictum in *People* v. *Sears* (1965) 62 Cal.2d 737 [44 Cal.Rptr. 330, 401 P.2d 938]. In *Sears,* defendant was convicted of felony murder. For three years prior to the murder, defendant had slept in a garage nearby the cottage occupied by his wife. Then the spouses separated and defendant moved to a hotel. Three weeks later, he returned to the cottage, looking for his wife and hiding a reinforced steel pipe under his shirt. In an ensuing struggle, he killed his wife's daughter. This court reversed his conviction because a confession was improperly admitted, but for guidance upon retrial we declared valid a felony-murder instruction based on burglary—entering the cottage with intent to assault his wife—as the felony. In answer to defendant's argument that he could not be guilty of burglary because he had a right to enter the house, the court replied, "One who enters a room or building with the intent to commit a felony is guilty of burglary even though permission to enter has been extended to him personally or as a member of the public. [Citation.] The entry need not constitute a trespass. [Citations.] Moreover, since defendant had moved out of the family home three weeks prior to the crime, he could claim no right to enter the residence of another without

permission. Even if we assume that defendant could properly enter the house for a lawful purpose (cf. Civ. Code, § 157), such an entry still constitutes burglary if accomplished with the intent to commit a felonious assault within it." (*Id.,* at p. 746.)

As the above quotation indicates, our opinion that Sears could be convicted of burglary was based on two separate considerations. First, Sears had no right to enter his wife's house; that fact alone supported the conviction. Second, even if he had a right to enter, the right was based on former section 157 of the Civil Code (now § 5102), which gave a person the right to enter the *separate* property of his or her spouse, subject to certain conditions. Thus Sears' "right" to enter his wife's house, like the "right" of the felon to enter the store in *Barry,* was at best conditional. An entry for anything but a legal purpose was a breach of his wife's possessory rights, in marked contrast to the entry in the present case.[4]

Only if the *Sears* dictum is read in an expansive manner can it be used to support the prosecution theory that a person can burglarize his own home. Such a reading would be entirely inconsistent with the purposes of section 459. As aptly articulated by the Court of Appeal in *People* v. *Lewis* (1969) 274 Cal.App.2d 912, 920 [79 Cal.Rptr. 650], "Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence. The laws are primarily designed, then, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety." Section 459, in short, is aimed at the danger caused by the unauthorized entry itself.

In contrast to the usual burglary situation, no danger arises from the mere entry of a person into his own home, no matter what his intent is. He may cause a great deal of mischief once inside. But no emotional distress is suffered, no panic is engendered, and no violence necessarily erupts merely because he walks into his house. To impose sanctions for burglary would in effect punish him twice for the crime he committed

---

[4]The dictum in *Sears* proved not to be controlling even for Sears himself. This court subsequently reversed a second conviction on the ground that felony murder must be based on a felony independent of the homicide. (*People* v. *Sears* (1970) 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847].) The burglary was predicated on Sears' intent to commit assault with a deadly weapon, a crime not independent of the homicide. We did not reconsider the issue whether Sears could be convicted of burglary.

while in the house. In such circumstances it serves no purpose to apply section 459.[5]

It has been urged that the purpose of burglary laws is to protect persons inside buildings because indoor crime is more dangerous than outdoor crime. It is true that in *People* v. *Wilson* (1969) 1 Cal.3d 431, 440 [82 Cal.Rptr. 494, 462 P.2d 22], we said, "We have often recognized that persons within dwellings are in greater peril from *intruders* bent on stealing or engaging in other felonious conduct." (Italics added.) However, we have never categorized all indoor crimes to be more dangerous than all outdoor crimes. Nor would such a conclusion be relevant to the purposes of section 459. █ The statute protects against *intruders* into indoor areas, not persons committing crimes in their own homes.

To hold otherwise could lead to potentially absurd results. If a person can be convicted for burglarizing his own home, he could violate section 459 by calmly entering his house with intent to forge a check. A narcotics addict could be convicted of burglary for walking into his home with intent to administer a dose of heroin to himself. Since a burglary is committed upon entry, both could be convicted even if they changed their minds and did not commit the intended crimes.

In positing such hypotheticals, we indulge in no idle academic exercise. The differing consequences are significant, for the punishment for burglary is severe. First degree burglary is punishable by imprisonment for five years to life,[6] while a second degree burglar is subject to imprisonment in the county jail for a one-year maximum or in state prison for one to fifteen years. (Pen. Code, § 461.) In contrast, the punishment for assault with a deadly weapon, the underlying crime committed in this case, is less severe: imprisonment in state prison for six months to life or in county jail for a maximum of one year, or a fine. (Pen. Code, § 245, subd. (a).)[7]

---

[5]Thus the People's argument that we should examine the purposes of the burglary laws from the victim Miller's perspective misses the mark. Miller, in contrast to the usual burglary victim, was not endangered by defendant's *entry* into the apartment. He was in jeopardy because defendant borrowed a shotgun and chose to use it for an assault. Miller's safety would not have been enhanced if the two roommates had never left the premises, had quarreled inside the apartment and defendant there produced a gun. In either case, the crime committed is assault with a deadly weapon, and application of the burglary statute adds nothing to the victim's protection.

[6]First degree burglary, the crime charged in the present case, includes nighttime burglaries of dwellings and armed burglaries. (Pen. Code, § 460.)

[7]The penalties for both burglary and assault with a deadly weapon are substantially increased when a firearm is used in commission of the crime. (Pen. Code, § 12022.5.)

For the foregoing reasons, we conclude defendant cannot be guilty of burglarizing his own home, and the judgment of conviction for burglary must therefore be reversed.

■ Defendant also claims the trial court interfered with counsel's right to control the litigation by appointing counsel under circumstances which compelled him to present an untenable defense. Specifically, defendant argues that counsel, improperly induced to defer to defendant's wishes, failed to present his strongest case—a plea of not guilty by reason of insanity and a defense of diminished capacity.

Two previous attorneys were unable to agree with defendant as to whether present insanity should be pleaded. The court, after two hearings on the matter, found defendant competent to stand trial. The ultimate trial attorney, in a long pretrial discussion with the court, stated that a plea of not guilty by reason of insanity and a defense of diminished capacity were viable options. However, he reported that his client declined to plead insanity, and a diminished capacity defense presented tactical problems. During the course of colloquy with the court, counsel said, "I determine it to be a mandate of the Court by appointing me on this case that I am to proceed according to Mr. Gauze's wishes."

It is clear that counsel could not have entered, by himself, a plea of not guilty by reason of insanity for defendant. Penal Code section 1018 mandates "Unless otherwise provided by law every plea must be put in *by the defendant himself* in open court." (Italics added.) This provision applies to pleas of not guilty by reason of insanity as well as to other pleas. (See *People* v. *Gaines* (1962) 58 Cal.2d 630, 636 [25 Cal.Rptr. 448, 375 P.2d 296].) Allowing counsel to enter an insanity plea without defendant's concurrence has been deemed reversible error. (*People* v. *Vanley* (1974) 41 Cal.App.3d 846 [116 Cal.Rptr. 446].)

Nor could the court on its own initiative compel an insanity defense, as was made clear in *People* v. *Redmond* (1971) 16 Cal.App.3d 931 [94 Cal.Rptr. 543], cited with approval in *In re Davis* (1973) 8 Cal.3d 798, 807-808 [106 Cal.Rptr. 178, 505 P.2d 1018]. In *Redmond,* defendant attempted to withdraw an insanity plea after being found guilty by a jury on a charge of assault. The trial judge refused to allow the withdrawal and, after a trial on the sanity issue, committed defendant to a state hospital. The Court of Appeal held that a presently sane defendant may withdraw an insanity plea, provided the court is satisfied that the

defendant is making a free and voluntary choice with adequate comprehension of the consequences. (See *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].) If a defendant may withdraw an insanity plea, certainly he cannot be compelled to present such a plea.

Defendant's reliance on *People* v. *Merkouris* (1956) 46 Cal.2d 540 [297 P.2d 999], is misplaced. In *Merkouris,* we held that the trial court abused its discretion in allowing a defendant, over his counsel's objection, to withdraw an insanity plea after he had been convicted of first degree murder. However, *Merkouris* is distinguishable from the present case in three crucial respects. First, *Merkouris* involved a withdrawal of a plea and was thus not explicitly covered by Penal Code section 1018, as is the present case. Second, there were severe unresolved doubts about Merkouris' *present* sanity; in contrast, defendant Gauze was twice found competent to stand trial. Finally, in *Merkouris* this court noted, "The colloquy between the court and the defendant relative to a withdrawal of the plea of not guilty by reason of insanity shows that the defendant did not understand the gravity of his predicament." (*Id.,* at p. 553.)

But in the present case the record clearly shows defendant knowingly refused to enter an insanity plea. Both his counsel and the court pointed out to defendant that since he had a prior first degree murder conviction—for which he was on parole at the time this crime was committed—he would likely spend the rest of his life in prison if convicted. Defendant, from 22 years of experience, was familiar with the inside of a prison. He was also told that if he were committed to a state hospital, his case would be periodically reviewed and some future day he would have a chance to be released. Defendant declared he was aware of the prison potential resulting from his decision, but insisted on the case being tried solely on his alibi defense: "at least that leaves a man, if there is any peace of mind in a case like this, with that little bit left." Asked point-blank whether, if found guilty, he would prefer state prison to a state hospital, defendant replied, "Correct. Yes, sir." Unlike the defendant in *Merkouris,* defendant Gauze made a free and voluntary choice with knowledge of its consequences. Neither counsel nor the court had power to contravene that choice.

Because we reverse defendant's burglary conviction, we need not consider any issues arising from counsel's failure to present a diminished capacity defense. ■ Assault with a deadly weapon is a general intent crime (*People* v. *Rocha* (1971) 3 Cal.3d 893, 899 [92 Cal.Rptr. 172, 479

P.2d 372]), and diminished capacity is not a defense to general intent crimes. (Pen. Code, §§ 20, 21; *People* v. *Noah* (1971) 5 Cal.3d 469, 477-478 [96 Cal.Rptr. 441, 487 P.2d 1009]; see *People* v. *Hood* (1969) 1 Cal.3d 444, 458 [82 Cal.Rptr. 618, 462 P.2d 370].) Counsel's alleged failure to assert the defense thus was not error.

Finally, defendant argues the sentence for assault with a deadly weapon constitutes cruel or unusual punishment. We recently answered a similar contention in *People* v. *Wingo* (1975) 14 Cal.3d 169 [121 Cal.Rptr. 97, 534 P.2d 1001].

The judgment is reversed on count I (burglary) and affirmed on count II (assault with a deadly weapon).

Wright, C. J., McComb, J., Tobriner, J., Sullivan, J., Clark, J., and Richardson, J., concurred.